Filed 1/14/14  Marriage of Wang and Cunningham CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re the Marriage of MARY WANG and ARCHIBALD CUNNINGHAM. | |
| MARY WANG,<br><br>          Respondent,<br><br>v.<br><br>ARCHIBALD CUNNINGHAM,<br><br>          Appellant. | A135787<br><br>(San Francisco County<br>Super. Ct. No. FDI03-753770) |

Archibald Cunningham appeals from an order entered May 25, 2012, by the San Francisco Superior Court, denying his order to show cause (sometimes OSC) requests for modification of existing child custody and visitation orders, and for other relief arising from the dissolution of his marriage to Mary Wang and related child custody proceedings.[1]  The other relief sought by Cunningham and denied by the court included: appointing a guardian and counsel for the minor child; a full psychological evaluation of

---

[1] Cunningham has been declared a vexatious litigant and subject to a prefiling order in this court.  This appeal and a related writ petition were filed on behalf of Cunningham by attorney Patrick Missud.  Missud is currently the subject of a State Bar recommendation for disbarment and has been ordered transferred to involuntary inactive status pursuant to Business and Professions Code section 6007, subdivision (c)(4).  (*In re Patrick Alexandre Missud,* case No. 12-O-10026-LMA, filed July 1, 2013.)  Under *Shalant v. Girardi* (2011) 51 Cal.4th 1164, 1168, Cunningham may continue to prosecute this appeal and writ in propria persona, despite having been declared a vexatious litigant who is no longer represented by counsel.

1

Wang; a "two-tier evaluation" of the child; lifting of orders declaring him a vexatious litigant; and vacating an order against him under the Domestic Violence Prevention Act (Fam. Code, § 6200 et seq.) (DVPA).[2]

Cunningham raises numerous claims of error. Chief among them is his claim that the trial court erred in denying him the right to call witnesses and to present oral testimony in connection with his OSC requests. (§ 217; rules 5.113, 5.250 and former rule 5.119.) Consistent with his past practice, Cunningham seeks to use this appeal as a vehicle to attack previous trial court orders, long since final. We refuse to follow him down this rabbit hole and shall address only those claims properly cognizable on this appeal. That said, resolution of this appeal requires some description of a few of the many previous proceedings and orders in this case.

## BACKGROUND

### 1. *Order Awarding Sole Custody to Wang*

In May 2007, Wang was awarded sole legal and physical custody of the parties' child. Cunningham was granted visitation. We affirmed that order in an unpublished opinion on August 20, 2008. (*Wang v. Cunningham* (Aug. 20, 2008, A118629) at pp.*5, 20, review den. Nov. 12, 2008.)[3] In affirming, we referenced findings made by the trial court, including its finding that " '[t]he current joint physical and joint legal custody arrangement [has] been detrimental to the child in that the frequent transitions and instability has caused trauma to the child. [Citation.]' The court specifically found: 'The failure of this shared custodial arrangement is due to: a) Father's inability to co-parent with Mother; b) Mother has historically, and continues to this day, to make all major decisions for the child, because Father unreasonably withholds his approval; c) Father does not support [the daughter]'s academic progress; d) Father is not able to

---

[2] Unless otherwise indicated, all statutory references are to the Family Code and all references to rules are to the California Rules of Court.

[3] Additional factual and procedural background may be found in our unpublished opinions *Wang v. Cunningham, supra,* (Aug. 20, 2008, A118629) and *Wang v. Cunningham* (March 30, 2011, A124717) [nonpub. opn.], review den. July 13, 2011.)

focus on the child's needs and is instead focused upon conflict with the Mother; e) Father is connected with Mother through these legal proceedings; f) Father is a poor role model for his daughter; and g) the child continues to be traumatized because of this conflict.' " (*Id.* at p. *17.)

**2. *Judgment On Reserved Issues, Including Orders Denying Motion to Modify Custody, Denying Further Visitation, Declaring Cunningham Vexatious, and Granting a DVPA Restraining Order***

On April 12, 2010, following a hearing held February 22 through 25, 2010 at which oral testimony was presented, the court issued its "Final Decision On the Issues of [Wang's] Request for a Restraining Order and to Declare [Cunningham] a Vexatious Litigant and an Award of Attorneys' Fees and [Cunningham's] Request for a Change of Custody." Therein, the court adopted its tentative statement of decision of March 15, 2010, which, among other things, denied Cunningham's request to modify the existing custody and visitation plan, denied him visitation, granted Wang's request for a restraining order under the DVPA (§ 6200 et. seq.) and section 2047, restrained Cunningham for five years from harassing Wang, including, but not limited to annoying telephone calls, emails and letters, and declared him to be a vexatious litigant under Code of Civil Procedure, section 391, subdivision (b) (1), (2) and (3).

On April 30, 2010, the superior court entered its judgment on reserved issues. [4] With respect to child custody and visitation, the judgment stated: "[Cunningham's] request . . . for a modification of the custody and visitation plan is hereby denied. Based on the statements made by [Cunningham] in open court, and on the evidence presented in this matter, [Cunningham] shall have no further visitation with the minor child. The order specified that, "Should [Cunningham] seek the right to visit his daughter, he must demonstrate a willingness to comply with the Court's orders contained within the DV-130 [restraining order after hearing] and that he is capable of peaceful communications with [Wang] limited solely to the immediate welfare of his daughter."

---

[4] The court initially entered the order denying visitation on February 26, 2010.

Cunningham later sought to challenge the April 30, 2010 judgment by bootstrapping a challenge to his appeal of a January 30, 2012 order. We refused to entertain the appeal on the ground that the April 30, 2010 order "was final long ago." (*Wang v. Cunningham* (January 31, 2013, A134757 [nonpub. opn.], review den. Apr. 10, 2013.)

**3. *June 17, 2011 Denial of Ex-parte Application Seeking Reinstatement of 50-50 Custody***

On June 17, 2011, the trial court issued an order denying Cunningham's ex parte application seeking reinstatement of the original 50-50 custody order, appointment of a custody evaluator, and trial of the custody issue. The order stated his request was denied by the court without a hearing and that "[t]he reasons for doing [so] are as follows:

"1. The relief [Cunningham] seeks has been addressed in the past, most recently in the Judgment entered on April 30, 201[0] after trial.[5] [Cunningham's] pleadings present neither a factual or legal basis for the relief requested.

"2. The April 30, 201[0] judgment is a final Judgment on the issues addressed. One of the issues was custody and visitation. [Cunningham's] pleadings fail to present any evidence even suggesting that there has been a change in circumstance, a requirement to warrant consideration of the relief requested. [(*Montenegro v. Diaz* (2001) 26 C[al].4th 249, 256; [*In re*] *Marriage of Burgess* (1996) 13 C[al].4th 25, 37.]) Moreover, the above Judgment requires that if [Cunningham] seeks visitation with his daughter that [he] 'must demonstrate a willingness to comply with the Court's orders contained within the DV-130 and that he is capable of peaceful communications with [Wang] limited solely to the immediate welfare of his daughter.' As set forth in [Wang's] opposition, [Cunningham] continues to harass [Wang] by making contact with her family and making threats to her attorney.

"3. The record continues to support the finding that it is not in the minor's best interest to have contact with her father.

---

[5] Although the court stated the date of this judgment as "April 30, 2011," the court clearly was referring to the judgment entered April 30, 2010.

4

"a. As set forth in detail in the Court's Tentative Statement of Decision filed on March 15, 2010 (which became a Final Decision) at pages 4 through 10, the record demonstrates that [Cunningham] possesses an extreme level of hostility to [Wang]. At page 10 of this decision, the Court recites [Cunningham's] reference to an event reported in SFGATE.COM where a parent kills a child and then commits suicide. In [Cunningham's] words: 'In light of my experience, I'm surprised most custody disputes don't end up in murder-suicide. . . . The only difference I see between you and the Mount Diablo Mom is a lot of money and the fact that she had more resolve and honesty in her megalomania and selfishness . . . .

"b. [Cunningham] continues to reference this event in a November 13, 2010 letter to [Wang's] counsel: 'Of course that smear works and murder-suicides are rampant in custody disputes. . . . did you read about Judith Williams and her 16 year old son, the scene of the Mr. Diablo crime? . . . yes, I used to think those people are crazy too . . . now I know better . . . now I read about those tragedies and recognize that behind the scenes are sleaze bag lawyers and outrageously incompetent judges pushing them over the brink.'

"c. On February 11, 2010, [Cunningham] stated on the record that he had no intention of following the existing custody and visitation order that the Court had reaffirmed after giving [Cunningham] the opportunity to present evidence of changed circumstances. After rejecting [Cunningham's] request for relief, [Cunningham] announced that he had no intention of following the Judgment of February 21, 2008, affirmed by the Court of Appeal on August 20, 2008; that he intended to move to France and have no contact with his daughter. That conduct lead [Wang] to request that visitation be terminated; a request the Court granted based on the facts before it.

"d. [Wang's] opposition also contains a note that [Cunningham] sent to the daughter along with what appeared to be sand. However, it was not sand from a beach she used to visit with [Cunningham]; rather, the package contained the

5

ashes of the family dog when the child had not known of the dog's demise. The child became deeply upset at the receipt of this package and [Cunningham's] heartless way of telling the child of the dog's death.

"e. [Cunningham] is a deeply troubled man, who poses a risk to mother, child and mother's attorney. Unless and until [Cunningham] addresses his deep seated hatred for mother, it is not in the child's best interest to see her father. As his words indicate, the child is at risk of serious harm."

"4. Finally, the Court required that [Cunningham] file an updated I&E [Income and Expense Declaration] if he wished to address the issue of custody and visitation so as to determine whether the vexatious litigant requirement of posting a bond of $5,000 should be imposed before consideration of this issue. [Cunningham's] I&E reflects that he has monthly income of $7,705 and expenses of $3,565. Plainly, [Cunningham] has the financial wherewithal to post the bond and he has not done so."

**4.** *Request for OSC Regarding Modifications and Case Resolution Order #1*

On April 11, 2012, through his attorney Missud, Cunningham filed a request for an order to show cause regarding modification of visitation in which he sought to modify custody and the order of February 26, 2010 denying him visitation (apparently also intending to modify the judgment on reserved issues entered April 30, 2010), which he characterized as having "[t]erminated father's parental rights."[6] Additional relief sought in that request included: appointment of a guardian for the minor child; a full psychological evaluation of Wang; a "two-tier evaluation" of the child; lifting of orders declaring him a vexatious litigant; and vacating of the DVPA restraining order. Hearing was set for May 15, 2012.

_____

We note that sole custody granted to one parent "does not, however, serve to 'terminate' the other parent's parental rights or due process interest in parenting. He or she has secondary visitation rights as ordered by the court [citation] and retains the right to seek and obtain a custody modification based on a proper showing of changed circumstances. [*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 958.]" (Hogoboom and King, Cal. Practice Guide: Family Law (The Rutter Group, 2013) ¶ 7:301, p. 7-110.) (Hogoboom and King, Family Law.) Nor does the court's restriction or denial of visitation constitute a "termination" of parental rights.

The request for an order to show cause also contained a "Witness List as Mandated by Family Code Section 217," wherein Cunningham proposed to call as witnesses Dr. Melinda Miller, the child's therapist; Dr. William Perry, the former child custody evaluator; Hon. Donald Sullivan, a judge involved in previous custody proceedings and proceedings involving the DVPA and contempt actions against Cunningham; Honorable Laurie Zelon, the chairperson of the *Elkins* task force[7]; Maria Schopp, Wang's attorney; Wang herself; and the child. Individual "notices" denominated "Notice of Presentation of Oral Testimony" were also filed pursuant to section 217 and rule 3.1306 (b), as to each proposed witness except for Justice Zelon. They again summarized the substance of the testimony expected from each witness.

On April 18, 2012, the court filed "Case Resolution Order #1" (hereafter CRO #1) in connection with the hearing calendared for May 15. In CRO #1, the court recognized that the case had "been in single assignment since January 2009, and that since that time the court [had] issued orders addressing many substantive issues, including custody and visitation, a permanent restraining order against [Cunningham] and a finding that [Cunningham] is a vexatious litigant." The court found that the case met the criteria for the superior court's Case Resolution program, adopted by the San Francisco Superior Court in 2011. The order stated in relevant part: "Accordingly, this case is now a part of Case Resolution and subject to the following orders regarding setting matters for hearing.

"1. This case remains singly assigned to Judge Patrick J. Mahoney and is assigned to Department 405 for all purposes unless otherwise ordered.

"2. For the hearing calendared by [Cunningham] for May 15, 2012, parties are ordered to file on or before May 10, 2012 a statement addressing the issues set forth in paragraph 3 to enable the Court and the parties to address the remaining issues in this case in a manner consistent with the applicable law and the prior findings of the Court

_____

[7] The task force had been set up by the Judicial Council at the recommendation of the California Supreme Court in *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 (*Elkins*), "to study and propose measures to assist trial courts in achieving efficiency and fairness in marital dissolution proceedings and to ensure access to justice for litigants, many of whom are self-represented." (*Id.* at p. 1369, fn. 20.)

7

that are final determinations of fact and law. *Until these issues are addressed, the Court finds that it is not appropriate to take oral testimony at the May 15, 2012 [hearing] and the parties are ordered not to subpoena any witness for that hearing. At the conclusion of the hearing on May 15, a determination shall be made on the need for oral testimony and if so, when that shall occur.* [Italics added.]

"3. The issues to be addressed in the parties' May 10, submission:

"a. Compliance with the Judgment of April 30, 2010 and subsequent order of June 17, 2011 related to visitation.

"b. If [Cunningham] contends that the Judgment of April 30, 2010 is not a final determination of the issues, he must provide legal support for that proposition.

"c. List each appeal taken or writ filed since the Findings and Order After Hearing on February 26, 2010 and the results thereof.

"d. What facts is [Cunningham] prepared to offer to meet the two prong burden of proof that the proposed new arrangement is in the child's best interest and there is a substantial change in circumstances warranting a modification. [Citations.]

"e. Whether it is in the best interest of [the child] to have counsel appointed for her.

"f. Whether it is in the best interest of [the child] to be interviewed by a Family Court mediator who then would issue a Tier II report on visitation with [Cunningham].

"g. Whether there should be supervised visits between [Cunningham] and [the child].

"h. The legal basis for the request that Judge Sullivan be a witness.

"i. Whether the parent having legal custody must consent to testimony from [the child's] therapist.

"j. Whether it is in [the child's] best interest to testify in open court and alternatives thereto.

"k. Whether Dr. Perry and Dr. Miller have been contacted and are willing to testify.

8

"l.  Whether [Cunningham] has arranged to pay the expert fees for Dr. Perry and Dr. Miller to appear and testify.

"m.  The proposed testimony of Ms. Schopp [, Wang's attorney,] relates to issues in which the Court has made rulings that are now final.  As a consequence, what is the basis for seeking this testimony.

"4.  On May 10, 2012, the parties are to file current Income and Expense declarations and [Cunningham] is to address his ability to retain counsel and bring forward expert witnesses while insisting that he ought not to be required to post a bond.

"5.  Requests for New Hearings:  All new requests for hearings, including, but not limited to, orders to show cause, notices of motion, orders to show cause re: contempt, and at issue memorandum, shall be directed to Department 402 and shall follow the procedure set forth in this paragraph.  *Ex parte* requests shall follow the procedure set forth in Paragraph 6.  Domestic Violence Prevention Act restraining order requests shall follow the same procedure as set forth in San Francisco Local Rule 11.9.

"[¶] . . . [¶]"  (Bolding omitted.)

Cunningham filed a petition for writ of mandate challenging this CRO #1.  We denied the petition on April 16, 2012.

On April 25, 2012, counsel for Wang filed a response to CRO #1, stating that counsel had never been served with the OSC or any pleading filed by Cunningham for that hearing, in the manner required by the court.

Missud filed a case resolution statement on behalf of Cunningham, that erroneously characterized the February 26, 2010 custody order as having "terminated all of [Cunningham's] parental rights."  He maintained Cunningham had a right to call witnesses at the May 15 hearing under Family Code section 217.  In response to the questions posed by CRO # 1, the statement reiterated Cunningham's grievances against previous court orders and rulings.  *It offered no argument that since the April 2010 order denying visitation, Cunningham had dealt with the issues the court had found warranted denial of visitation or that he was willing to comply with the domestic violence restraining order.*  Rather, it challenged the court's findings regarding Cunningham's

9

"deep hatred" of Wang, complained Cunningham was denied contact with the child and maintained that he could not "show any 'facts' unless he [could] call witnesses and subpoena school documents . . . ." The statement maintained Cunningham needed to call professional evaluators and the therapist to answer whether severing of one parent's contacts with the child was in that child's best interest. It speculated that Drs. Miller and Perry would express "shock" that Cunningham was denied visitation.

With respect to the inquiry about his compliance with the June 17, 2011 order, the statement challenged the court's finding with respect to Cunningham's need to deal with his "deep-hatred" of Wang before restoration of visitation as unconstitutionally vague. The statement also urged the court to appoint counsel for the child so that such counsel would protect her right to a relationship with Cunningham.

Responding to the inquiry as to the legal basis for calling Judge Sullivan, Cunningham's statement merely cited Evidence Code section 703.5, which was clearly inapplicable, as Judge Sullivan was no longer presiding at the trial. Further, it completely ignored the prohibition of Evidence Code section 703.5 on calling a judge who had presided at a civil proceeding in any subsequent civil proceeding "as to any statement, conduct, decision, or ruling, occurring at or in conjunction with the prior proceeding," with certain exceptions not here applicable.

Cunningham acknowledged he had not contacted either Dr. Perry or Dr. Miller, but speculated they would testify in his favor that severing the child's relationship with him was not in her best interest.

As to supervised visitation, Cunningham stated he would be satisfied with nothing less than a return to 50-50 custody, arguing there had been no hearing on detriment or the child's best interest. He sought to have the child testify, as permitted by Family Code section 3042, stating he "suspects that [she] will cry inconsolabl[y] when she testifies about how she feels and whether she has missed her father and whether her mother has tried to suppress any talk of the father and repress her feelings toward the father." He argued for a second two-tier evaluation of the child, acknowledging she had participated in such an evaluation in 2008 when she was nine years old, and he accused Wang and

10

attorney Schopp of securing a fraudulent custody order that was detrimental to the child's wellbeing.

Cunningham's statement also argued that the previous visitation and custody orders were not "final" because there had never been a fully litigated hearing in the underlying custody matter. The statement challenged our affirmance of the custody order in 2008 (*Wang v. Cunningham, supra,* A118629, at p. *20), contending that our determination was contrary to *Elkins, supra,* 41 Cal.4th at page 1357. Similarly, the statement contended that the February 26, 2010 order and the April 30, 2010 judgment denying Cunningham visitation (which the statement persisted in characterizing as "terminating all his parental rights") were not based on a fully litigated hearing and so were not "final." The statement accused Judge Mahoney of being "complicit in Ms. Schopp[']s deliberate violation of the law and violation of [Cunningham's] due process rights . . . ." The statement also challenged the June 17, 2011 order denying Cunningham's ex parte application for reinstatement of 50-50 custody, as being full of "factual errors, misrepresentations, and bad faith conclusions" and accusing the court of a "pure fabrication, a deliberate lie to justify an order made in excess of all of a family law judge's authority." (Our review of the February 26, 2010 hearing transcript discloses that Judge Mahoney accurately summarized the substance of Cunningham's diatribe, wherein Cunningham announced that he had no intention of following the existing custody and visitation orders.)

### 5. *May 15, 2012 Hearing*

At the May 15, 2012 hearing, Missud represented Cunningham. The minutes for the hearing reflect that the court confiscated Missud's tape recorder on the ground that no authority or permission was given to Cunningham or his counsel to allow them to record the proceedings. The court noted that no proof of service showed that Wang's counsel Schopp had been served, as required by the court's prior orders. After argument, the court found there was no basis for Cunningham's requests for appointment of a guardian for the child, for a full psychological evaluation of Wang or for a two-tier evaluation of the child, for lifting the vexatious litigant order or for vacating the DVPA order. It

11

denied these requests. The court took remaining issues under submission and allowed further pleadings and responses, including requiring Missud to file further briefing pursuant to Code of Civil Procedure section 128.7 on sanctions, visitation, and Cunningham's most recent motion to disqualify the judge.[8] The parties did so.

**6. *Case Resolution Order #2 Findings and Order After Hearing***

On May 25, 2012, the court filed its Case Resolution Order #2 (CRO #2), denying Cunningham's requests, including his request to present oral testimony and call witnesses. The order provided as follows:

"Prior to the hearing, the Court direct[ed] the parties to address a series of questions to elicit legal arguments relevant to [Cunningham's] pending request for relief, including determining that [Cunningham] is no longer a vexatious litigant, termination of the restraining order against [Cunningham] and reinstatement of a 50/50 custody arrangement. In support of this relief, [Cunningham], represented by counsel, declined to file the previously set vexatious litigant bond on the grounds this deprived [Cunningham] of due process and [Cunningham's] expressed desire to call witnesses to testify regarding

---

[8] This hearing was not reported, as noticed by the San Francisco Superior Court website which provided: "Pursuant to Rule 2.956 (b)(1), and effective immediately, the Superior Court of California, County of San Francisco, will post the Departments in which the services of Official Court Reporters will not normally be available during regular Court hours. A notice shall be posted on the outside of each affected Department and in the Clerk's Office, Room 103, Civic Center Courthouse.

"Pursuant to Rule 2.956(c), if the services of an Official Court Reporter are not available for a hearing or trial in a civil case, a party may arrange for the presence of a certified shorthand reporter to serve as an official pro tempore reporter. It will be that party's responsibility to pay the reporter's fee for the attendance at the proceedings, but the expense may be recoverable as part of the costs, provided by law.

"If a party arranges and pays for the attendance of the certified shorthand reporter, none of the parties will be charged the reporter's attendance fee provided for in Government Code [section] 68086[, subdivisions] (a)(1) or (b) (1).

"It is further noticed that the stenographic notes of the certified shorthand reporter are the official records of the Court and shall be secured by the Court in either paper and/or electronic format in accordance with [Government Code section] 69955[, subdivisions] (a), (b), (c) and (d)." <http://www.sfsuperiorcourt.org/divisions/reporters>

the issues presented. Having considered the parties' submissions and the arguments of counsel, the Court makes the following Order.

"1. [Cunningham]'s request to find that he is no longer a vexatious litigant is denied. [Cunningham]'s pleadings continue to assert his alleged right to share 50/50 custody of his daughter and [Cunningham]'s refusal to accept the fact that this issue has been addressed repeatedly in the trial court and affirmed on appeal. [Cunningham] makes no effort to present evidence of changed circumstances.

"2. The Court's Order of June 17, 2011 delineates the reasons for denying [Cunningham] custody and visitation with his daughter. That Order was challenged by [Cunningham] in the Court of Appeal which declined to accept [Cunningham]'s arguments. As a consequence before there can be any change in custody or visitation, [Cunningham] must present evidence that he has engaged in meaningful efforts to address the rage he directs toward [Wang] and that he is willing to resume visitation with his daughter in a supervised setting. [Cunningham]'s rage continues as reflected in the exhibits submitted by [Wang] in [her] Statement re: Case Resolution Order # 1. It was further illustrated by [Cunningham's] behavior during the hearing when he engaged in repeated and loud 'conversations' with his attorney disparaging [Wang]'s counsel and the Court despite admonitions by the Court that such conduct was unacceptable. At one point, [Cunningham] stormed out of the Court in the middle of the proceedings.

"3. For the reasons stated in paragraph 2, the Restraining Order must remain in place.

"4. [Cunningham] presents no evidence warranting consideration of the appointment of a Legal Guardian for the minor. The record reflects that the child is doing well and [Wang] has done an exemplary job in parenting the child in the face of [Cunningham's] overriding hostility. [Cunningham]'s request for a full psychological evaluation of mother is denied.

"5. The request to appoint counsel for the minor and/or to order a two-tier evaluation of the child is denied. Unless and until [Cunningham] is able to demonstrate that he is capable of managing his anger and is willing to engage in supervised visits,

13

there is no reason to involve the child. In so ruling, the Court is willing to assume that the child desires to see her father. In fact that is the desire of the Court. However visitation cannot resume unless and until [Cunningham] addresses his rage and is willing to engage in supervised visits. That is the only way to ensure that the child will be safe for the reasons delineated in the Order of June 17, 2011.

"6. [Cunningham]'s request to call witnesses is denied. The reasons stated in [Cunningham]'s Case Resolution Statement filed April 30, 2012 are without merit.

"7. [Wang]'s request for attorneys' fees and sanctions for once again being required to address these issues is granted. [Wang] is awarded $2,000 in sanctions pursuant to Family Code [section] 271. At the outset, [Wang] was required to appear at a hearing on April 3, 2012 which was continued at [Cunningham]'s request that [his] [Code of Civil Procedure section] 170.1 motion to disqualify be addressed. Subsequently, that motion was struck, a ruling challenged unsuccessfully by [Cunningham] by writs to the Court of Appeal and the California Supreme Court. Then, [Wang]'s counsel [was] required to attend the hearing on May 15, 2012 to once again respond to [Cunningham]'s contentions simply because [he] refuses to abide by the Court's rulings on this subject and because [Cunningham] was able to find counsel to file the papers on his behalf.

"8. Going forward, the Court finds that [Cunningham] remains a vexatious litigant and that a bond must be filed in the amount of $1,500 to protect [Wang] from further harassment and the need to respond to [Cunningham]'s repeated claims. The only exception to the bond would be a filing by [Cunningham] that is limited to resuming visitation, an acknowledgement that the visitation plan begins with supervised visits and [Cunningham] explains the steps that he has taken to address his expressed anger toward [Wang] and demonstrate that he can safely maintain visits with his daughter.

"9. At the conclusion of the hearing on May 15, 2012, the Court directed [Cunningham]'s counsel to file a pleading addressing the issue of sanctions under [Code of Civil Procedure section ] 128.7. [Cunningham]'s counsel has done so.

"a. California Rule[s] of Court[, rule] 1.150(d) specifies the steps that must be taken before a party is authorized to use a personal recording device to transcribe a court

14

proceeding. [Cunningham]'s counsel did not follow this procedure and began to record the proceedings absent the consent of the judge presiding over the hearing. Counsel apparently contends that an email to Court's Presiding Judge or Chief Executive Officers of [*sic*] the Manager of Court Reporters is sufficient compliance. It is not.

"b. Counsel acknowledges that he advised [Cunningham] that counsel 'knew nothing about family law' and agreed to represent [Cunningham] on the vexatious litigant issue. [Citation.] Yet, the pleadings counsel puts his name to are replete with family law issues and on their face, appear to be written by [Cunningham] himself with counsel merely lending his name to the filing.

"c. The pleadings filed are replete with an inaccurate statement of the facts and the law to be applied to the facts of the case. It is for this reason that the Court issued Case Resolution Order #1 and directed the parties to address among other issues the effect of the Court's earlier rulings and [Cunningham]'s failure to overturn those rulings. The pleading filed by counsel is devoid of any meaningful analysis that would support the relief requested. As to the visitation issue, counsel fails to address the Court's prior findings; rather, counsel's filings are replete with arguments made in the past and rejected. When asked to address the testimony of witnesses, it is obvious that the experts were not consulted, nor any thought was given to securing their testimony, let alone any theory that would authorize the taking of testimony from a judge who made earlier rulings in the case.

"d. [Code of Civil Procedure section ] 128.7 authorizes the imposition of sanctions for presenting to the Court or advocating to the Court an unwarranted legal contention and/or unsupported factual contention. Counsel has an affirmative duty to investigate the positions taken before filing pleadings reflecting such positions. The inquiry must be reasonable under the circumstances. [Citation.] The test is an objective one. Here, the pleadings filed by counsel seeking disqualification, termination of the vexatious litigant finding, termination of the restraining order, the challenge to the present visitation order, and the asserted need for testimony fail to meet the mandate of

15

[Code of Civil Procedure section] 128.7. Moreover, counsel failed to comply with California Rules of Court regarding the recording of proceedings.

"e. For the reasons stated, sanctions in the sum of $1,500 are assessed against Paul Missud, counsel for [Cunningham]. The sanctions are to be paid within 30 days to [Wang]."

On May 31, 2012, Missud on behalf of himself and Cunningham, filed a "Request for Clarification of Case Resolution Order #2," challenging the court's order in numerous respects and accusing the judge of corruption. On June 7, 2012, the court denied the request for clarification.

This timely appeal followed.

## DISCUSSION

Initially, we reiterate that the May 2007 judgment awarding sole custody of the child to Wang and the April 30, 2010 judgment denying Cunningham visitation and declaring him to be a vexatious litigant were final long ago, as was the order granting the DVPA restraining order.

The only issues properly before us on this appeal relate to the May 25, 2012 CRO #2, denying Cunningham's OSC requests, and specifically:

1. Whether the San Francisco Superior Court Case Resolution Program and the CROs issued under that program deny due process and equal protection of the law. Whether they contravene state statutes and case law by denying litigants the right to present oral testimony on any orders to show cause. (See *Elkins, supra,* 41 Cal.4th at pp. 1351-1352.)

2. Whether the court erred in denying Cunningham the right to present oral testimony with respect to his OSC regarding modification of the custody and visitation orders and his other claims for relief.

3. Whether the court erred in requiring Cunningham to demonstrate changed circumstances in order to modify the custody order.

4. Whether the court erred in denying his other requests for relief, i.e. , reinstatement of visitation, appointment of a guardian or counsel for the minor child; a

16

full psychological evaluation of Wang; a "two-tier evaluation" of the child; lifting of orders declaring him a vexatious litigant and vacating an order against him under the DVPA.

6. Whether the court erred in refusing to allow him to tape record the May 15, 2012 hearing.

## I. The right to an evidentiary hearing in family law cases

We begin with the seminal case of *Elkins, supra,* 41 Cal.4th 1337. There, the California Supreme Court held that at contested family law *trials* leading to judgment, courts may not prohibit oral testimony or require parties to present their case at trial by affidavits. (*Id.* at pp. 1355-1357.) The parties have a right " '*to present all competent, relevant, and material evidence,* bearing upon any issue properly presented for determination.' " (*Id.* at p. 1357, italics added.) Each party has the right to testify in his or her own behalf, to call witnesses to testify and to proffer admissible evidence. (*Id.* at p. 1357.)

The Supreme Court in *Elkins* distinguished the "requirement that at a contested marital dissolution trial, prior to entry of *judgment*, the court must hold an evidentiary hearing on the disputed issues, at which the usual rules of evidence apply" (*Elkins, supra,* 41 Cal.4th at p. 1361), from established authority holding that "once a *judgment* has been entered in the custody matter, a postjudgment *motion* or request for an order to show cause for a change in custody . . . requires an evidentiary hearing only if *necessary*—that is, only if the moving party is able to make a prima facie showing [of detriment] to the child or has identified 'a material but contested factual issue that should be resolved through the taking of oral testimony.' ([*In re Marriage of*] *Brown & Yana* [(2006)] 37 Cal.4th [947,] 962; see *id*. at p. 959.)" (*Elkins.* at p. 1360.) "Indeed, we explained that a trial court had authority to deny a full evidentiary hearing in *Brown & Yana* in part *because* the custody issue already had been fully litigated and the resulting judgment therefore was entitled to substantial deference in the absence of a showing of a significant change of circumstances. [Citations.]" (*Id.* at p. 1361.)

17

This distinction appears to have been undermined by the subsequent enactment of Family Code section 217, subdivision (a), and rule 5.113 (formerly rule 5.119), which effectively extend to the parties at OSC and motion hearings in family law proceedings the rights that *Elkins, supra,* 41 Cal.4th 1337 concluded must be afforded the parties at contested family law *trials* leading to judgment. (See Hogoboom and King, Family Law, *supra,* at ¶ ¶ 5:491.1, 7:562.3, pp. 5-193, 7-225.)

Family Code section 217 provides:

"(a) At a hearing on any order to show cause or notice of motion brought pursuant to this code, absent a stipulation of the parties *or a finding of good cause pursuant to subdivision (b), the court shall receive any live, competent testimony that is relevant and within the scope of the hearing* and the court may ask questions of the parties.

"(b) *In appropriate cases, a court may make a finding of good cause to refuse to receive live testimony and shall state its reasons for the finding on the record or in writing.* The Judicial Council shall, by January 1, 2012, adopt a statewide rule of court regarding the factors a court shall consider in making a finding of good cause.

"(c) A party seeking to present live testimony from witnesses other than the parties shall, prior to the hearing, file and serve a witness list with a brief description of the anticipated testimony. If the witness list is not served prior to the hearing, the court may, on request, grant a brief continuance and may make appropriate temporary orders pending the continued hearing." (Italics added.)

At the time the court issued the CROs here, the factors to be considered by the trial court in making a finding of good cause to refuse to receive live testimony under Family Code section 217 were set forth in former rule 5.119. [9] (Former rule 5.119 was

_____

[9] Former rule 5.119, effective January 1, 2011, provided:
"(a) Purpose  [¶] Under Family Code section 217, at a hearing on any order to show cause or notice of motion brought under the Family Code, absent a stipulation of the parties or a finding of good cause under (b), the court must receive any live, competent, and admissible testimony that is relevant and within the scope of the hearing.
"(b) Factors  [¶] A court must consider the following factors in making a finding of good cause to refuse to receive live testimony under Family Code section 217:

18

repeated and replaced by rule 5.113, effective January 1, 2013, which is substantially similar.)

Consequently, absent a finding of good cause by the court, Cunningham had a right to present live, competent testimony, that was relevant and within the scope of the hearing on his order to show cause. The right is statutorily based on Family Code section 217.

---

"(1) Whether a substantive matter is at issue—such as child custody, parenting time (visitation), parentage, child support, spousal support, requests for restraining orders, or the characterization, division, or temporary use and control of the property or debt of the parties;

"(2) Whether material facts are in controversy;

"(3) Whether live testimony is necessary for the court to assess the credibility of the parties or other witnesses;

"(4) The right of the parties to question anyone submitting reports or other information to the court;

"(5) In testimony from persons other than the parties, whether there has been compliance with Family Code section 217(c); and

"(6) Any other factor that is just and equitable.

"(c) Findings  [¶] If the court makes a finding of good cause to exclude live testimony, it must state its reasons on the record or in writing. The court is required to state only those factors on which the finding of good cause is based.

"(d) Minor children  [¶] When receiving or excluding testimony from minor children, in addition to fulfilling the requirements of Evidence Code section 765, the court must follow the procedures in Family Code section 3042 and California Rules of Court governing children's testimony.

"(e) Witness lists  [¶] Witness lists required by Family Code section 217(c) must be served along with the order to show cause, notice of motion, or responsive papers in the manner required for the service of those documents. If no witness list has been served, the court may require an offer of proof before allowing any nonparty witness to testify.

"(f) Continuance  [¶] The court must consider whether or not a brief continuance is necessary to allow a litigant adequate opportunity to prepare for questioning any witness for the other parties. When a brief continuance is granted to allow time to prepare for questioning witnesses, the court should make appropriate temporary orders.

"(g) Questioning by court [¶] Whenever the court receives live testimony from a party or any witness it may elicit testimony by directing questions to the parties and other witnesses." (Bolding omitted.)

19

## II. The Case Resolution Program

In issuing its CRO # 1, the family court referenced the San Francisco Superior Court's adoption of a Case Resolution Program in 2011, and found the case met the criteria for the program. Cunningham argues the Case Resolution Program adopted by the San Francisco Superior Court denies him and other litigants like him due process and equal protection of the law, in that it places obstacles in the way of those involved in protracted custody disputes or other "difficult" cases who seek to exercise their right to present oral testimony and live witnesses. He further argues the program is constitutionally vague. We disagree.

In 2010, Family Code section 2450 was amended to allow the court to order case management *without* the stipulation of the parties. (See Fam. Code, §§ 2450 and 2451; Hogoboom and King, Family Law, *supra,* ¶¶ 5:200-5:203, pp. 5-95 through 5-100.) "The purpose of family centered case resolution is to benefit the parties by providing judicial assistance and management to the parties in actions for dissolution of marriage for the purpose of expediting the processing of the case, reducing the expense of litigation, and focusing on early resolution by settlement. Family centered case resolution is a tool to allow the courts to better assist families. . . ." (Fam. Code, §§ 2450, subd. (a).) " 'Family centered case resolution' had its genesis in the former statutory program for a 'judicial case management plan' that could be ordered only upon the parties' stipulation. That program is now significantly expanded . . . ." (Hogoboom and King, Family Law, at ¶ 5:200.1, p. 5-95.) Hogoboom and King observe that a family court may now order a family case resolution plan in an appropriate dissolution case on motion of a party or sua sponte, subject to due process limitations. (*Ibid.*; see Fam. Code § 2450, subd. (b).) "The current statutory scheme for a family centered case resolution plan eliminates the party stipulation requirement [citations]. In its place, however, the Code expressly states that a family centered case resolution plan '*must be in conformance with due process requirements . . . .*' (Fam. C[ode] § 2451[, subd.] (a).)" (Hogoboom and King, Family Law, at ¶ 5:201, p. 5-96, italics added.)

20

In his related writ petition (*Cunningham v. Superior Court* (A137742)), Cunningham has requested we take judicial notice of the response of Ann Donlan, Superior Court Communications Director, to his public records request and of the two records attached thereto, described in the Donlan response as: "A March 2011 list of cases included on a list titled 'Family Case Resolution Hearings Department Assignments' [hereafter, Department Assignments]" and " '[a] policy document titled, 'Case Resolution Calendar Protocol and Guidelines [(hereafter, CRC Protocol)].' " '[10] This case, *Wang v. Cunningham* [Superior Court No. FDI-03-753770], is listed on the "Dormant List" of the Department Assignments list. The reason given for its dormant status is "On Appeal". It is unclear whether the San Francisco Superior Court currently utilizes the program. The response from Donlan states, in pertinent part: "Unfortunately the list [of cases included on the Department Assignments] has not been updated beyond its initial creation because the court employees responsible for maintaining it were laid off in September 2011."

In his request for judicial notice, Cunningham maintains that these records are relevant because they show the family court uses the CRC Protocol to deny hearings that would otherwise be required by Family Code section 217 and principles of due process. CRC Protocol, section 2, provides: "2. **Purpose:** The Case Resolution calendar will allow the judicial officer to track the litigation to ensure timely resolutions. The Court will determine the outstanding issues and the steps needed to resolve those issues. The Case Plan will limit multiple *hearings by requiring judicial approval before a new hearing is set.* (See "Request for Hearing and Order Thereon.)" (Italics added.)

At the outset, we observe that the superior court's implementation of family centered case resolution, pursuant to Family Code sections 2450 and 2451, cannot be utilized to undermine a litigant's statutory right to an evidentiary hearing to which the litigant is otherwise entitled. Sections 2450 and 2451 do not purport to provide such

---

[10] We grant the request for judicial notice and deny the writ petition in *Cunningham v. Superior Court* (A137742) by separate order filed with this opinion.

21

authority. Indeed, they expressly provide that "[a] court-ordered family centered case resolution plan must be in conformance with due process requirements . . . ." (§ 2451.)

However, we reject Cunningham's claim that the family centered case resolution process, as it existed at the time the CROs here were issued, denied him or others due process. To the extent the live testimony requirement of *Elkins, supra,* 41 Cal.4th 1337, was based upon due process principles—and the Supreme Court expressly refused to determine that question, basing its determination on hearsay rule requirements (*id.* at p. 1345) —the Supreme Court acknowledged that motions and OSC requests *after* judgment were not subject to the requirement. (*Id.* at pp. 1360-1361, 1363, 1345 & fn. 1.) The requirements with respect to hearings on motions and OSC requests were put into place by statute and rule and are subject to the good cause exception set forth therein, as well as to the requirement that the live testimony sought to be presented be "competent testimony that is relevant and within the scope of the hearing." (§ 217; see former rule 5.119; rule 5.113.)

Cunningham claims that the "purpose" statement of the San Francisco Superior Court's CRC Protocol has been used to deny him access to court and to undermine his rights to present live testimony, to call witnesses and to present evidence at a hearing on his OSC requests. Because the family court could not limit Cunningham's statutory right to present live testimony at a hearing on his OSC requests in a manner inconsistent with section 217 or with due process, the key question here is whether the court in the circumstances met the requirement of that statute.

### III.  Section 217 – Good Cause

Section 217 requires that in making its finding of "good cause" to refuse to receive live testimony, the court "shall state its reasons for the finding on the record or in writing." (§ 217, subd. (b).) Standing alone, the court's finding that the reasons for calling witnesses and presenting live testimony stated in Cunningham's April 30, 2012 response to the court's prehearing CRO # 1 "are without merit" is insufficient to comply with the requirement of subdivision (b) that the court "state its reasons on the record or in writing." However, that statement does not stand alone. To find the court's reasons

22

inadequate in a vacuum would ignore the comprehensive statements of the court's reasons for requiring Cunningham to respond to the questions raised in CRO #1 before allowing him to call the witnesses he requested and the court's explanation of the bases for denying his requests in CRO #2 and orders referred to therein.

Consequently, in determining whether good cause supported the trial court's refusal to allow Cunningham to present the live testimony he requested, we look to the witness list proffered by Cunningham pursuant to section 217, to the two CROs issued by the court and the orders referenced therein, to the parties' responses to CRO #1, and to their supplemental papers filed pursuant to the court's request following the May 15, 2012 hearing. Considered together, these orders and pleadings constitute a more than sufficient statement of reasons for the court's refusal to allow Cunningham to present the live witness testimony he sought.[11]

We reiterate that the family court's obligation is to receive proffered live testimony that is "*competent, and admissible,*" "*relevant and within the scope of the hearing.*" (§ 217, subd. (a), italics added; former rule 5.119(a), rule 5.113.) "Clearly then, [section] 217 and Rule 5.113 [or former rule 5.119] do not open the door for a party to present his or her entire case or air and argue all of his or her accusations and complaints at an OSC or motion hearing. Nor does the statute or Rule give the parties or the court a license to ignore the rules of evidence ('competent' testimony means admissible evidence—i.e., based on personal knowledge, no inadmissible hearsay, etc.)." (Hogoboom and King, Family Law, *supra,* ¶ 5:492, p. 5-194.)

In its CRO #1, the court explained that in light of the numerous previous orders in the case addressing substantive issues, the finding that Cunningham was a vexatious litigant, and the permanent restraining order against him, it was requiring the parties to answer a series of questions before determining the need for oral testimony. Such was

---

[11] The court did not expressly use the phrase "good cause" in denying Cunningham's request to present live testimony and review would have been easier had it done so with a concise summary of its reasons. However, to reverse and remand on this basis would serve little purpose in this case, where good cause is abundant and was adequately articulated by the court, albeit without expressly denominating it as such.

23

necessary to "enable the Court and the parties to address the remaining issues in this case in a manner consistent with the applicable law and the prior findings of the Court that are final determinations of fact and law." In CRO #2, the court further explained that it had issued CRO #1 because Cunningham's "pleadings filed are replete with an inaccurate statement of the facts and the law to be applied to the facts of the case." The court further found that the pleadings filed by Cunningham's attorney were "devoid of any meaningful analysis that would support the relief requested. As to the visitation issue, counsel fails to address the Court's prior findings; rather, counsel's filings are replete with arguments made in the past and rejected."

We agree with the court's characterization of Cunningham's pleadings. The vast majority of the evidence sought to be presented by Cunningham was outside the scope of the hearing. Rather than seeking a modification of the orders for custody and visitation in light of changed circumstances, indicating a willingness to comply with the court's visitation prerequisites, or attempting to show that he was no longer vexatious, the evidence Cunningham sought to present was aimed at revisiting and challenging orders already final, on the basis that they were erroneous when made. In these circumstances, there was "good cause" for the court's decision to require Cunningham to answer the questions raised in CRO #1.

As to the specific witnesses Cunningham sought to call and the testimony he sought to elicit from them, Cunningham failed to show that they could present competent, admissible, and relevant evidence that was within the scope of the hearing.

He presented no applicable legal authority that could allow him to call Judge Sullivan regarding the legality of the DPVA order, the judge's previous rulings in the case, or the judge's opinion regarding proceedings in the case. (See Evid. Code, § 703.5, [prohibiting such].) Similarly, Cunningham utterly failed to identify any testimony that Judge Sullivan or Wang's attorney Schopp (whom he stated would testify about her previous "improper[] and illegal" behavior in relation to the visitation order, the vexatious litigant order, and obtaining sanctions against Cunningham) could provide that would be within the scope of the hearing.

24

Similarly, the testimony Cunningham sought to present from therapist Miller and former custody evaluator Perry was clearly aimed at challenging the order granting sole custody to Wang and the order denying visitation unless and until Cunningham demonstrated he was not a risk to the child. Cunningham did not claim, and it does not appear, that such testimony was presented in order to support *modification* of custody on the ground of changed circumstances or that it would address the concerns that led to the court's imposition of a no visitation order. Rather, Cunningham refused to accept the finality of the previous orders and his filings repeated his "arguments made in the past and rejected." In addition, the court found it was "obvious that the experts were not consulted, nor any thought . . . given to securing their testimony . . . ."

With respect to his desire to call Wang, the notice states the testimony to be elicited from her related to her actions preventing him from knowing about his daughter and the alleged smearing of Cunningham's character as part of a "legal strategy calculated to destroy the father's custody rights and because she does not want and is incapable of sharing custody or visitation." In its CRO #2, the court referenced its previous final order of June 17, 2011, stating it "delineates the reasons for denying custody and visitation." CRO #2 states that before any change in custody or visitation, Cunningham "must present evidence that he has engaged in meaningful efforts to address the rage he directs toward [Wang] and that he is willing to resume visitation with his daughter in a supervised setting." The court found Cunningham's "rage continues," as reflected in the exhibits submitted by Wang in her response and by Cunningham's behavior at the May 15, 2012 hearing. Findings incorporated into the June 17, 2011 order delineating reasons for denying custody and visitation, included reiterating findings detailed in the May 9, 2007 order granting sole custody to Wang, including finding that Cunningham was unable to co-parent the child, as reflected in his e-mail correspondence with Wang, "and his investment in continuing the conflict with [Wang]." "*Father is not able to focus on the child's needs and is instead focused upon conflict with Mother; . . . Father is connected with Mother through these legal proceedings; . . . and . . . the child*

*continues to be traumatized because of this conflict.*" (Italics added.) [12] These findings present ample "good cause" for the court's refusal to allow Cunningham to call Wang to testify at the hearing on his motion to modify custody. Not only was the testimony he wished to elicit from Wang outside the scope of the hearing, which was addressed to modification of the existing orders and required evidence of changed circumstances; but also, good cause for denying the oral testimony by Wang was provided by the findings that Cunningham was using the legal proceedings as a way to continue his connection with Wang and was focused upon his conflict with her and his rage at her, rather than upon the best interests of their child.

Finally, the court had ample reason to deny Cunningham's request to call the 12-year-old child to testify. In CRO #1, the court had asked the parties to address "[w]hether it is in [the child's] best interest to testify in open court and alternatives thereto." Cunningham speculated in his request that the child would testify that her mother would not allow her to speak to or have contact with her father; that Wang had told the child Cunningham means to harm the child; that the child misses being with Cunningham and that she wants a relationship with him; that she cried after her dog died and was upset that she was not allowed to visit the dog. Section 3042 provides that "[i]f a child is of

[12] In the custody order of May 9, 2007, the court cited to the custody evaluation conducted by Perry in finding: "Additional reasons which demonstrate an order of sole legal and sole physical custody to Mother is in the child's best interest is Father's inability to focus on the child's needs, because his judgment is clouded-over by his rage at Mother for ending their relationship. (Child Custody Evaluation, page 10, ¶ 3.) The facts presented in this case show Father is not able to focus on and serve the child's best interests, because his anger at Mother, rather than the best interests of his daughter, remains his primary focus from which he cannot or will not detach. (Child Custody Evaluation, ¶ 4.) Father's communications with Mother are often mean-spirited, insulting, insensitive, disrespectful, threatening and pejorative. Father is, therefore, clear[ly] not serving the needs of [the child] and his negative and destructive conduct do not serve [her] best interests. Mother, on the other hand, is a good and conscientious parent, and is the parent who is primarily focused on the child and the child's needs. (Child Custody Evaluation , ¶ 3.) . . . ." In the June 17, 2011 order referenced by the court in its CRO #2 of May 25, 2012, the court stated that it *"remains true today as it was in 2007,"* that Cunningham "does not want resolution of this case and he is attached to the conflict between himself and Mother." (Italics added.)

26

sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation, the court shall consider, and give due weight to, the wishes of the child in making an order granting or modifying custody or visitation." (§ 3042, subd. (a).) Here, in denying Cunningham's requests to appoint counsel for the child and to order a two-tier evaluation of the child, the court explained: "Unless and until [Cunningham] is able to demonstrate that he is capable of managing his anger and is willing to engage in supervised visits, there is no reason to involve the child. *In so ruling, the Court is willing to assume that the child desires to see her father.* In fact that is the desire of the Court. However visitation cannot resume unless and until [Cunningham] addresses his rage and is willing to engage in supervised visits. That is the only way to ensure that the child will be safe for the reasons delineated in the Order of June 17, 2011." (Italics added.)

As observed by Hogoboom and King: "[A] child's participation in family law matters must be considered on a case-by-case basis. No statutory mandate, rule, or practice requires children to participate in court or prohibits them from doing so. When a child does wish to participate, 'the court should find a balance between protecting the child, the statutory duty to consider the wishes of and input from the child, and the probative value of the child's input while ensuring all parties due process rights to challenge evidence relied upon by the court in making custody decisions.' [Citations.]" (Hogoboom and King, Family Law, *supra*, ¶ 7:324, p. 7-131.) Moreover, before allowing a child under age 14 to testify, "the court must first determine it would be appropriate pursuant to the child's best interests. [Citations.]" (*Id.* at ¶ 7:324.2, p. 7-132, citing Fam. Code, § 3042, subd. (d); *Chalmers v. Hirschkop* (2013) 213 Cal.App.4th 289, 313 [statute simply requires court give "due weight" to child's preferences and the court *may* permit a child under 14 years to address the court if it finds doing so is in child's best interest].)

Here, the court could well determine it was not in the child's best interest to testify in this proceeding. In stating its willingness to assume the child desires to visit with her father and in view of the high level of conflict between the parents, Cunningham's investment in maintaining the conflict, rather than pursuing his daughter's best interest,

the suffering of the child due to the conflict, and the level of vitriol and disrespect for the court and opposing parties that Cunningham brings to the proceedings in which he has participated, a case-specific consideration of the child's participation supports the court's determination. Moreover, given the court's willingness to assume the child desired visits, Cunningham was not prejudiced in the court's refusal to let him call the child to testify. The court did not abuse its discretion in refusing Cunningham's request to call the child. Nor, in these circumstances, did the court abuse its discretion in refusing to appoint counsel for the child to communicate her wishes to the court.

The court did not err in denying Cunningham's requests for another two-tier custody evaluation of the child and in refusing to appoint a guardian for the child. Nothing in Cunningham's pleadings indicated any reasonable bases for such requests nor did Cunningham present any evidence supporting a need for a psychiatric evaluation of Wang.

Nothing in Cunningham's pleadings or papers suggested a need for live testimony relating to his request for lifting of orders declaring him a vexatious litigant and vacating an order against him under the DVPA. He provided no reason to believe that he had in any way changed his attitude or the behaviors that led the court to declare him vexatious and to impose the restraining order again him. His arguments boiled down to his many times rejected legal claims that the court erred in declaring him vexatious and in granting the restraining order in the first place. The court did not err in refusing to lift the vexatious litigant order or the DVPA restraining order.

Assuming, without deciding, that section 217 applies to requests to lift vexatious litigant orders and DVPA restraining orders in family law cases, we are convinced that good cause supports the trial court's refusal to entertain oral testimony at the hearing on the OSC.

## IV. Changed Circumstances – Custody Modification

Cunningham contends here, as he contended below, that the doctrine of changed circumstances did not apply to his requests for modification of custody. He is wrong.

28

As observed by our Supreme Court in *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256: "Although the statutory scheme only requires courts to ascertain the 'best interest of the child' [citations], this court has articulated a variation on the best interest standard once a final judicial custody determination is in place. Under the so-called changed circumstance rule, a party seeking to modify a permanent custody order can do so only if he or she demonstrates a significant change of circumstances justifying a modification. ([*In re Marriage of* ] *Burgess* [(1996)] 13 Cal.4th [25,] 37.) According to our earlier decisions, '[t]he changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test. It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements.' (*Burchard* [*v. Garay* (1986)] 42 Cal.3d [531,] 535.)"

Consequently, to justify a change in custody, there must be a persuasive showing by the noncustodial parent of substantial changed circumstances relating directly to the child's best interests. (*In re Marriage of McLoren* (1988) 202 Cal.App.3d 108, 116 [family court abused its discretion in changing custody from sole to joint legal custody in the absence of a showing of substantially changed circumstances].) The moving party has the burden not only of establishing that circumstances now warrant a change in custody, but also that modification of custody is in the child's best interests. (*Id.* at p. 114; see *In re Marriage of Burgess, supra,* 13 Cal.4th at pp. 37-38; *Burchard v. Garay, supra,* 42 Cal.3d at p. 535; Hogoboom & King, Family Law, *supra,* ¶¶ 17:310- 17:311, pp. 17-75 to 17-76.) Although the decision to modify the custody arrangement generally should be based upon the circumstances existing at the time of the requested

modification, prior conduct may be considered by the court in determining which parent will serve the best interests of the child.  (*In re Marriage of McLoren,* at p. 115.)

The court did not err in applying the changed circumstances test or in refusing to modify the order granting Wang sole physical and legal custody.  Cunningham's claim that the custody order was not final has been repeatedly rejected.  We need not address it further.

## V.  Modification of Visitation

"[T]he changed circumstances rule does not apply when a parent requests only a modification of the *visitation* arrangement (whether in a joint custody or sole custody situation).  Because such a modification does not change 'custody,' the trial court considers a visitation modification solely under the *child's best interests* standard.  [([*In re*] *Marriage of Lucio* (2008) 161 [Cal.App.]4th 1068, 1077–1080 (citing text) (collecting cases)—noncustodial parent who had supervised visitation not required to show changed circumstances in support of request for unmonitored visits and additional visitation time not amounting to 'de facto joint custody']."  (Hogoboom and King, Family Law, *supra,* at ¶17:302.3,  p.17-74; see also, *Chalmers v. Hirschkop, supra,* 213 Cal.App.4th at p. 305 ["When a legal parent seeks to modify a visitation schedule set forth in a final custody order, the changed circumstance rule does not apply.  [Citations.]  The court has residual and broad discretion to modify visitation orders for legal parents to ' "obviate time-consuming custody litigation . . . ." '  [Citation.]"].)

The court here explained its reasons for refusing to modify the visitation order.  Those reasons were rooted in its determination of the best interests of the child.  In its CRO #2, the court stated explicitly that despite its wish that visitation could be resumed, "visitation cannot resume unless and until [Cunningham] addresses his rage and is willing to engage in supervised visits.  That is the only way to ensure that the child will be safe for the reasons delineated in the Order of June 17, 2011."  Ample evidence supports the court's determination that visitation would not be resumed until Cunningham complied

with the requirements the court set in place to provide for the child's safety. Such requirements are consistent with the mandate of section 3100, subdivision (b), that in making a visitation order, "the court shall consider whether the best interest of the child requires that any visitation by [the parent to whom a protective order as defined in section 6218 has been directed] shall be limited to situations in which a third person, specified by the court, is present, or whether visitation shall be suspended or denied. . . ." (§ 3100, subd. (b); see also §§ 3031, subd. (c) [essentially the same where emergency protective order "or other restraining order" has been issued]; 6323, subd. (d) [same in DVPA proceedings]; Hogoboom and King, Family Law, *supra*, ¶ 7:489, p. 7-190.) "The ultimate decision lies within the court's discretion. However, the exercise of discretion must reflect a consideration of the *nature of the acts* from which the parent was enjoined and the *period of time* elapsed since the order issued. [Citation.]" (Hogoboom and King, Family Law, *supra*, ¶ 7:489.1, p. 7-190.) Such was the case here.

## CONCLUSION

Ample evidence supported the court's denial of the OSC requests in this case. Further, the court's refusal to take oral testimony at the hearing on the OSC was supported by good cause, pursuant to section 217.

## DISPOSITION

The order after judgment entered May 25, 2012 is affirmed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Brick, J.*


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.